IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                            NO.  CR 04-1315 RB

MARISELA BARRERA,
NINA CHEROMIAH,
and SHERELL COX,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant Barrera's Motion to Suppress Evidence and Statements (Doc. 31), filed on August 11, 2004, and Defendant Cheromiah's Motion to Suppress Evidence and Statements (Doc. 32), filed on August 12, 2004.  Defendant Cox was permitted to join in the motions.  On September 2, 2004, I held a suppression hearing, received evidence, and heard arguments.  Having considered the briefs, evidence, arguments of counsel, and being otherwise fully advised, I find that the motions should be denied.

## I.  Background.

Marisela Barrera, Nina Cheromiah and Sherell Cox were arrested after a roving patrol officer discovered 117 pounds of marijuana in their vehicle.  Barrera argues that the stop was not supported by reasonable suspicion, the continued detention exceeded the permissible scope of the stop, and her consent to a dog search was tainted by the Fourth Amendment violations.  Cheromiah argues that the

stop was not supported by reasonable suspicion and the continued detention exceeded the permissible scope of the stop.


## II.  Facts.

United States Border Patrol Agent Christopher Dooley testified that, on April 7, 2004, he was on roving patrol on Interstate 25 (I-25) near Hatch, New Mexico.  Dooley was alone in his vehicle with his assigned Border Patrol canine.  At about 7:00 p.m., Dooley parked his unmarked vehicle near the mile marker 41 overpass so that he could observe traffic coming from Hatch and entering I-25 northbound.   The overpass is about eighty five miles from the border.

Agent Dooley testified that smugglers use state Highway 26 from Deming to avoid the  fixed checkpoints south of Hatch on I-25 and Highway 185.  Smugglers traveling north from El Paso detour west on Interstate 10 to Deming, then take Highway 26 northeast to Hatch and then rejoin I-25 northbound.  The detour through Deming adds about an hour and a half to the trip from El Paso to points north as compared to taking a direct route on I-25.  Although vehicles must pass through the I-10 checkpoint on the Deming route, inspections at the I-10 checkpoint are minimal due to heavy traffic.  At times traffic is waved through the I-10 checkpoint for safety considerations.  On the day in question the traffic was heavy on I-10, but every vehicle was being checked at the I-25 checkpoint.

At about 7:30 p.m., Dooley saw an older model gray van approach from the Hatch area.  The van displayed a Texas temporary tag.  The size of the vehicle indicated that it might be used to transport illegal aliens.  The van's left turn signal was activated, indicating a turn onto I-25 northbound.  The van slowed as it turned and Dooley was able to see the female driver and front seat female passenger.  Dooley was sitting in his unmarked border patrol vehicle, with the window down.

He was in uniform and his hat and badge were on the dashboard. Dooley observed the two women in the front seats of the van stiffen up, look straight ahead, and avoid eye contact with Dooley. As the van turned, Dooley saw other bodies in the back; one sitting up and one diving down. The windows of the van had some type of covering, but Dooley was able to see movement of people in the back of the van.

Based on his experience, Agent Dooley believed that the van may have come from El Paso, through Deming, in order to avoid the I-25 checkpoint. Agent Dooley surmised that the van might contain undocumented aliens, and he decided to stop the vehicle to perform an immigration inspection of the occupants.

Dooley followed the van onto I-25 north and stopped it at mile marker 42. The driver identified herself as Marisela Elvira Barrera. Dooley asked if she was a United States citizen. Barrera responded that she was. The front seat passenger identified herself as Sherell Lyn Cox and responded that she was a United States citizen. A small child was standing between Cox and Barrera. The child was young enough to be in diapers.

Dooley asked Barrera where they were coming from and where they were going. Barrera responded that they were coming from Deming, where they had dropped off a family member, and that they were headed to Denver. When asked if she was the owner of the van, Barrera replied that she had just purchased it in El Paso. Dooley asked if they were traveling together, and Barrera responded that they were. Dooley asked if they had taken the highway between Deming and Hatch, to which Barrera stated that they had done so.

Barrera stated that, after purchasing the van in El Paso, they traveled to Deming to drop off her aunt and were heading home to Colorado. Dooley suspected that they had traveled through

Deming to avoid the I-25 checkpoint.

Dooley was able to see two other women in the back of the van, but was unable to see whether anyone else was back there. Dooley walked to the passenger side of the van and opened the sliding door. Vanessa P., a juvenile, was lying down on a rear bench seat. Nina Cheromiah was sitting in a rear seat. Dooley asked both of them whether they were United States citizens and both responded that they were. Vanessa P. stated they had taken a bus to El Paso from Denver the day before. All responses were in English. Dooley believed their claims of citizenship.

After he opened the sliding door, Dooley noticed a strong smell of soap or dryer sheets coming from the van. In his experience, Dooley had encountered situations where smugglers had used dryer sheets to mask the smell of narcotics. Dooley believed that the women might be using dryer sheets to conceal contraband. Dooley thought that it was strange that three women, a juvenile girl, and a small child had traveled together by bus from Denver to El Paso, purchased a van, dropped off a relative in Deming, and were returning to Denver the next day.

Dooley asked if he could conduct a canine search of the vehicle. Barrera consented to the canine search. Dooley asked all occupants to exit the vehicle and they complied. Agent Dooley inspected the vehicle with his assigned canine, "Jessie." Jessie alerted on the van, jumped inside, and indicated, by barking at a red duffle bag located in the rear of the vehicle. Upon opening the duffle bag, Dooley noticed several bundles wrapped in plastic cellophane. Dooley punctured one of the bundles and found fabric softener sheets wrapped around a green leafy substance. The green leafy substance field tested positive for marijuana. The search took about three to five minutes.

Dooley separated Barrera from the passengers and gave Miranda warnings to all of them. He called for back-up and informed the women that they were going to be transported to the I-25

4

checkpoint.  Back-up arrived in about ten to fifteen minutes.  The people and the van were transported to the border patrol checkpoint on I-25.  More bundles were found in the speaker boxes, as well as in two other small duffle bags near the rear seat of the van.  A total of 107 bundles, weighing just under 120 pounds, were seized.

Dooley wrote in his report that he smelled soap after he opened the sliding door on the passenger side of the van.  At the hearing, he testified that he smelled soap when he was at the driver's side window and when he opened the sliding door.  I find that Dooley did not smell the dryer sheets until he opened the sliding door.

## II.  Discussion.

### A.  Whether the stop was supported by reasonable suspicion.

The Fourth Amendment prohibits unreasonable searches and seizures by the Government. U.S. CONST. amend. IV.   Its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  With respect to a roving border patrol stop, the Fourth Amendment is satisfied if the officer's actions are supported by reasonable suspicion to believe that criminal activity may be afoot.  *Arvizu*, 534 U.S. at 273. *See also United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).

"Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (quotations and citations omitted).  Border patrol agents may stop vehicles if they are aware of specific articulable

facts, together with rational inferences from those facts, that reasonably warrant suspicion of criminal activity. *United States v. Gandara-Salinas*, 327 F.3d 1127, 1129 (10th Cir. 2003) (citing *United States v. Monsisvais*, 907 F.2d 987, 989-90 (10th Cir. 1990)).

The following factors are relevant in determining whether an immigration stop is supported by reasonable suspicion: (1) characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded. *Gandara-Salinas*, 327 F.3d at 1130. A law enforcement officer may assess these factors in light of his experience and specialized training. *Id.*

Barrera and Cheromiah argue that, when viewed one-by-one, their actions were not suspicious. The Supreme Court has expressly rejected this sort of "divide-and-conquer" analysis; a court may not evaluate and reject each factor in isolation. *Arvizu*, 534 U.S. at 274. The ultimate assessment of reasonable suspicion depends on the totality of the circumstances. *Id.* A court should accord deference to an officer's ability to distinguish between innocent and suspicious actions. *Gandara-Salinas*, 327 F.3d at 1130 (citing *United States v. De la Cruz-Tapia*, 162 F.3d 1275, 1277 (10th Cir. 1998).

Dooley encountered the van in an area frequented by smugglers located about eighty-five miles from the border. Dooley had previous experience with alien traffic on that route. Dooley knew that the traffic on I-10 was heavy that day relative to the traffic on I-25. Inspections at the I-10 checkpoint were minimal, but all vehicles were being stopped at the I-25 checkpoint. The van

6

displayed a Texas temporary tag. Barrera and Cox stiffened up, looked straight ahead and avoided eye contact when they saw Dooley in uniform. Dooley saw other bodies in the back; one sitting up and one diving down. The vehicle was a van and could have carried illegal aliens or concealed contraband. Based on these factors, there was reasonable suspicion to stop the van.

**B. Whether the continued detention exceeded the permissible scope of the stop.**

The scope of an investigative detention must be reasonably related in scope to the circumstances underlying the initial detention. *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc). In a roving patrol stop based on suspicion of immigration violations, an agent may investigate whether the vehicle contains illegal aliens. *United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir. 1992). However, the agent must have reasonable suspicion to further detain the defendant once the immigration-related reason supporting the initial detention is dispelled. *Id.*

In *Millan-Diaz*, the defendant was alone in his 1978 Ford Grenada when he was stopped on suspicion of transporting illegal aliens. *Id.*, 975 F.2d at 720. The agent asked the defendant for permission to search the trunk and the defendant consented. *Millan-Diaz*, 975 F.2d at 721. After confirming that there were no persons in the trunk, the agent began banging on the inside of the trunk, and shook the spare tire. *Id.* He later tapped on the side rocker panels. *Id.* The agents eventually discovered marijuana concealed in the car. *Id.* The district court held that the agent had reasonable suspicion that the defendant was transporting illegal aliens, but that the suspicion was dispelled once the agents looked in the vehicle and it became obvious that the defendant was the only person traveling in it. *Millan-Diaz*, 975 F.2d at 721. The Tenth Circuit affirmed, holding that the purpose of the stop was satisfied as soon as the agents determined that the defendant was the only person in the car. *Millan-Diaz*, 975 F.2d at 722.

In this case, the purpose of the stop was to determine whether illegal aliens the van carried illegal aliens.  Dooley was able to see Cheromiah and Vanessa P. in the back of the van, but was unable to see whether anyone else was back there.  Dooley walked to the passenger side of the van and opened the sliding door so that he could ascertain whether there was anyone else in the back of the van.   Dooley acted within the permissible scope of the stop when he opened the sliding door.  The scope of a warrantless search of a vehicle is defined by the expressed object of the search.  *United States v. Ross*, 456 U.S. 798, 820 (1982); *United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004) (holding that a canine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk as well).   Unlike *Millan-Diaz*, it was not obvious that there were no illegal aliens concealed in the back of the van.  Once he opened the sliding door, Dooley smelled soap or dryer sheets, products often used to mask the odor associated with drug smuggling.  The smell, combined with the factors that justified the stop, gave rise to an independent and articulable suspicion that the women had concealed narcotics in the van.

Barrera and Cheromiah rely on *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998).  This reliance is misplaced.  In *Winningham*, the Tenth Circuit implicitly acknowledged that a search for illegal aliens encompassed the interior of a van.  *Winningham*, 140 F.3d 1331.   However, in *Winningham*, the agents perceived nothing suspicious when they opened the door and looked inside the van.  *Id*, 140 F.3d at 1329.  Accordingly, reasonable suspicion was exhausted after the agents conducted a visual search of the interior and found no one inside.  In the instant case, Dooley smelled soap when he opened the door; a fact that is indicative of narcotics smuggling.  When combined with the circumstances of the stop, the smell of soap gave rise to an articulable suspicion that the women were transporting drugs.

8

**C.  Whether Barrera's consent to the canine search was tainted.**

Because the stop was valid and the scope was permissible, Barrera's consent to the canine search was not tainted by a Fourth Amendment violation.

**WHEREFORE,**

**IT IS ORDERED** that Defendant Barrera's Motion to Suppress Evidence and Statements (Doc. 31), filed on August 11, 2004, and Defendant Cheromiah's Motion to Suppress Evidence and Statements (Doc. 32), filed on August 12, 2004, are **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**