**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

vs.                                                               **NO.  CR 04-1315 RB**

**MARISELA BARRERA,**
**NINA CHEROMIAH,**
**and SHERELL COX,**

      **Defendants.**

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** came before the Court on Defendant Cheromiah's Motion to Reconsider Denial of Motion to Suppress Evidence and Statements (Doc. 51), filed on October 6, 2004.  Having considered the briefs, evidence, arguments of counsel, and being otherwise fully advised, I find that this motion should be denied.

      The Federal Rules of Criminal Procedure do not provide for motions to reconsider pretrial rulings.  However, the Tenth Circuit has recognized such a motion under the common law doctrine and considerations of judicial economy set forth in *United States v. Healey*, 376 U. S. 75 (1964). *See, e. g., United States v. Corey*, 999 F. 2d 493, 495 (10th Cir. 1993); *United States v. Anderson*, 85 F. Supp. 2d 1084, 1109-10 (D. Kan. 1999).  Motions to reconsider are essentially treated the same as motions to alter or amend judgment in the civil context under FED. R. CIV. P. 59(e).  *Anderson*, 85 F. Supp. 2d at 1109-1110.  They should be granted only "to correct manifest errors of law or to present newly discovered evidence." *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir.1997).  Whether to grant or deny a motion to reconsider is committed to the district court's sound discretion. *Id*.

Marisela Barrera, Nina Cheromiah and Sherell Cox were arrested after a roving patrol officer discovered 117 pounds of marijuana in their vehicle. Cheromiah filed a motion to suppress evidence and statements, arguing that the stop was not supported by reasonable suspicion and the continued detention exceeded the permissible scope of the stop. On September 2, 2004, I held a suppression hearing and heard the testimony of Border Patrol Agent Christopher Dooley. On September 15, 2004, I issued a memorandum opinion and order denying the motion. Cheromiah moves for reconsideration on the ground that the continued detention and visual search of the van exceeded the permissible scope of the stop because Dooley did not have probable cause or reasonable suspicion to believe that there were more than two persons in the rear of the van. In light of Cheromiah's arguments in support of her motion to reconsider, I have reviewed the testimony adduced at the hearing and the governing law. Based on the facts stated in my original memorandum opinion and order, as well as the facts restated and found herein, I have determined that my previous decision should stand.

In my September 15, 2004 memorandum opinion and order, I found that on April 1, 2004, Agent Dooley parked near the mile marker 41 overpass on I-25 so that he could observe traffic coming from Hatch, New Mexico, and entering I-25 northbound. At about 7:30 p.m., Dooley saw an older model gray van approach from the Hatch area. The van displayed a Texas temporary tag. The size of the vehicle indicated that it might be used to transport illegal aliens. The van's left turn signal was activated, indicating a turn onto I-25 northbound. The van slowed as it turned and Dooley was able to see the female driver and front seat female passenger. As the van turned, Dooley saw at least two other bodies in the back; one sitting up and one diving down. The windows of the van had some type of covering, but Dooley was able to see movement of people in the back of the van.

Agent Dooley surmised that the van might contain undocumented aliens, and he decided to stop the vehicle to perform an immigration inspection of the occupants. Dooley followed the van onto I-25 north and stopped it at mile marker 42. The driver identified herself as Marisela Elvira Barrera. Dooley asked if she was a United States citizen. Barrera responded that she was. The front seat passenger identified herself as Sherell Lyn Cox and responded that she was a United States citizen. A small child was standing between Cox and Barrera.

Dooley asked Barrera where they were coming from and where they were going. Barrera responded that they were coming from Deming, where they had dropped off a family member, and that they were headed to Denver. When asked if she was the owner of the van, Barrera replied that she had just purchased it in El Paso. Dooley asked if they had taken the highway between Deming and Hatch. Barrera replied that they had. Barrera stated that, after purchasing the van in El Paso, they traveled to Deming to drop off her aunt and were heading home to Colorado. Dooley suspected that they had traveled through Deming to avoid the I-25 checkpoint.

Dooley was able to see two other women in the back of the van, but was unable to see whether anyone else was back there. Dooley walked to the passenger side of the van and opened the sliding door. Vanessa P., a juvenile, was lying down on a rear bench seat. Nina Cheromiah was sitting in a rear seat. Dooley asked both of them whether they were United States citizens and both responded that they were.

After he opened the sliding door, Dooley noticed a strong smell of soap or dryer sheets coming from the van. Dooley asked for and received consent to perform a canine search. The canine alerted on the van, jumped inside, and barked at a red duffle bag located in the rear of the vehicle. Upon opening the duffle bag, Dooley noticed several bundles wrapped in plastic cellophane. Dooley

3

punctured one of the bundles and found fabric softener sheets wrapped around a green leafy substance. The green leafy substance field tested positive for marijuana. A subsequent search revealed more marijuana hidden in other luggage and speakers.

Dooley wrote in his report that he smelled soap after he opened the sliding door on the passenger side of the van. At the hearing, he testified that he smelled soap when he was at the driver's side window and when he opened the sliding door. I found that Dooley did not smell the dryer sheets until he opened the sliding door.

In addition to the facts found in my September 15, 2004 memorandum opinion and order, I find the following facts. When the van turned onto I-25, Dooley saw body movement in the back of the van. He saw at least one person sitting up and one person diving down. Dooley was unable to clearly ascertain the number of people in the back of the van, but his observations, later confirmed, indicated that there could have been more than two people in the back of the van. Although the windows of the van had some type of covering, Dooley was able to see movement of people in the back of the van. I take judicial notice of the fact that, on April 1, 2004, the sun set in Las Cruces at 6:26 p.m., and twilight ended at 6:51 p.m. It was dark when Dooley stopped the van.

Dooley testified that, as he stood by the driver's side window of the van, speaking with Barrera, he feared for his safety. I take judicial notice that, at mile marker 42, I-25 runs through a deserted area with a moderate traffic flow at the posted speed limit of 75 miles per hour. Traffic on I-25 northbound was passing directly behind Dooley as he stood by the driver's side window. Dooley was unable to see how many people were in the back of the van by looking in the driver's side window. In order to see the back of the van, Dooley had to look past Barrera and the driver's seat. The back windows of the van had some type of covering that partially obstructed Dooley's view.

Although Dooley was able to see Cheromiah and Vanessa P., he was unable to determine whether anyone else was in the back of the van. Dooley was unable to speak directly with Cheromiah and Vanessa P. from where he stood outside Barrera's window. Dooley needed to speak directly with Cheromiah and Vanessa P. in order to ascertain their citizenship. The detention took about three to five minutes.

As I observed in my September 15, 2004 memorandum opinion and order, the scope of an investigative detention must be reasonably related in scope to the circumstances underlying the initial detention. *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc). The scope of a warrantless search of a vehicle is defined by the expressed object of the search. *United States v. Ross*, 456 U.S. 798, 820 (1982). In a roving patrol stop based on suspicion of immigration violations, an agent may investigate whether the vehicle contains illegal aliens. *United States v. Millan-Diaz*, 975 F.2d 720, 722 (10th Cir. 1992). However, the agent must have reasonable suspicion to further detain the defendant once the immigration-related reason supporting the initial detention is dispelled. *Id*.

An officer may detain occupants of a vehicle for questioning if he has an objectively reasonable and articulable suspicion that illegal activity is occurring. *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001). The facts recited in my memorandum opinion and order of September 15, 2004, as supplemented herein, establish that Dooley had reasonable suspicion that the van concealed illegal aliens.[1] In her motion to reconsider, Cheromiah does not challenge the stop; she

---

1. In the September 15, 2004 memorandum opinion and order, I found that Dooley encountered the van in an area frequented by smugglers located about eighty-five miles from the border. Dooley had previous experience with alien traffic on that route. Dooley knew that the traffic on I-10 was heavy that day relative to the traffic on I-25. Inspections at the I-10 checkpoint were minimal, but all vehicles were being stopped at the I-25 checkpoint. The van displayed a Texas temporary tag. Barrera and Cox stiffened up, looked straight ahead and avoided eye contact when they saw Dooley in uniform. Dooley saw other bodies in the back; one sitting up and one diving down. The vehicle was a van and could have carried illegal aliens or concealed contraband.

challenges the scope of the detention and visual search.

The purpose of the stop was to determine whether illegal aliens were secreted in the van. At the overpass, Dooley saw at least two persons and body movement in the back of the van. As he stood by the driver's side window, Dooley was aware of at least five people in the van. However, he was unable to see whether anyone else was in the back of the van and he was unable to speak directly with Cheromiah and Vanessa P. Dooley acted within the scope of the stop when he opened the sliding door because he needed to ask Cheromiah and Vanessa P. about their citizenship and he needed to see whether anyone was hiding in the back of the van.

Moreover, the Supreme Court has observed that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). The "inordinate risk" inherent where "an officer . . . approaches a person seated in an automobile" justifies a per se rule that drivers and passengers may be ordered out of their vehicles during lawful traffic stops. *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (extending rule to passengers); *United States v. Hill*, 60 F.3d 672, 682 (10th Cir. 1995) (same).

The stop occurred after dark on a deserted stretch of highway. Dooley was unable to see whether there was anyone else in the back of the van and he had observed body movement. Dooley was concerned about his safety and was concerned that he was unable to see where the occupants hands were. These circumstances could give rise to an objectively reasonable belief that a hidden passenger posed a threat to officer safety. *See United States v. Brown*, 334 F.3d 1161, 1164-1170 (D.C. Cir. 2003) (holding that totality of the circumstances permitted the officer to open the door of an occupied parked car to allay safety concerns); *United States v. Stanfield*, 109 F.3d 976, 981-983

(4th Cir. 1997) (allowing officer approaching vehicle with heavily tinted windows to open at least one of the vehicle's doors and, without reaching inside vehicle, to visually inspect vehicle's interior). In this case, opening the sliding door presented a lesser privacy intrusion than ordering the occupants out of the van. *See Stanfield*, 109 F.3d at 982-83. The privacy intrusion effected by police opening a car door is "considerably less" than that approved by the Supreme Court in *Mimms*. *Id*. Dooley had reasonable grounds to suspect that the traffic stop posed a threat to his safety. Accordingly, Dooley was justified in opening the sliding door.

Considering the totality of the circumstances, Dooley was authorized to open the sliding door to (1) question Cheromiah and Vanessa P. about their citizenship, (2) visually inspect the back of the van for concealed illegal aliens, and (3) allay his reasonable fear that a hidden passenger posed a threat to his safety. Based on the totality of the circumstances, the detention and opening of the sliding door did not exceed the permissible scope of the stop.

**WHEREFORE,**

**IT IS ORDERED** that Defendant Cheromiah's Motion to Reconsider Denial of Motion to Suppress Evidence and Statements (Doc. 51), filed on October 6, 2004, is **DENIED**.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**